**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re: | Case No. 19-02764-jw |
| Sand Castle South Timeshare Owners Association, Inc., | Chapter 11 |
| Debtor. | |

**ADDENDUM TO DISCLOSURE STATEMENT TO
CHAPTER 11 PLAN OF LIQUIDATION FILED ON DECEMBER 18, 2019,
AS AMENDED**

Sand Castle South Timeshare Owners Association, Inc. (the "**Association**"), the debtor and debtor-in-possession in this case, hereby supplements and modifies the Disclosure Statement to Chapter 11 Plan of Liquidation ("**Disclosure Statement**") that it filed on December 18, 2019 as follows:

**SECTIONS INCLUDED IN THIS ADDENDUM**

1. Timing of the Proposed Sale of the Condominiums, and the Steps of the Sale Process………………………………………………………………………….….…page 2
2. The Progress and Status of the Adversary Proceeding…………………….page 3
3. The Expected Stalking Horse Bidder…………………………………………...page 4
4. Auction Sale as a "Back-Stop" if Unable to Sell the Condominiums……..page 5
5. Expected Administrative Priority Claims………………………………………page 5
6. Creditors Who May Be Deemed Insiders………………………………….page 7
7. *Ad Valorem* Taxes on the Condominiums……………………………………....page 7
8. Objections to Claims……………………………………………………………page 8
9. Tax Consequences of the Plan…………………………………………………..page 8
10. Distribution to Creditors………………………………………………………….page 9
11. Supplement to Liquidation Analysis in the Disclosure Statement……..…page 10
12. Treatment of Class 3 Under the Plan……………………………............…page 12
    Potential Preference Avoidance Actions, In the Event that Sale Price Does Not Fully Pay Creditors……………………………………………………….……page 13
13. Rejection Claims…………………………………………………………...page 14
14. Implementation and Consummation of the Plan Following Confirmation, and Indemnification of the Board…………………………………………….……page 14
15. Other Items Raised by the United States Trustee to Be Addressed……...page 14

**SUPPLEMENTAL INFORMATION AND
MODIFICATION OF DISCLOSURE STATEMENT**

1. <u>Timing of the Proposed Sale of the Condominiums, and the Steps of the Sale Process</u>. As stated by the Association since the inception of this case, the Association seeks to sell the 40 Condominiums that were under the now terminated Timeshare Plan.[1] The Condominiums are now owned by approximately 820 former timeshare owners, who, following the termination of the Timeshare Plan, collectively own them as tenants in common. In order to sell the Condominiums in a sale that would transfer full ownership to a buyer, the Association filed a partition action, as provided in S.C. Code § 27-32-520, *et al.*, which is the primary action in the Adversary Proceeding. The partition action is now far enough along that it is possible to project a likely sale time. The Association projects that it should be able to sell the Condominiums during June or July, 2020.

**The sale of the Condominiums is for four essential purposes**: first, to terminate continued accrual of expenses that can never be paid; second, to terminate the obligations of owners to pay maintenance fees and/or assessments; third, to provide a source for payment, to the extent possible, of creditors; and fourth, to abate and avoid public safety and health issues regarding property that would otherwise deteriorate and possibly develop environmental issues, *e.g.*, mold.

The sale process for the Condominiums involves three major steps. These necessary steps have dictated the pace of progress in this case. The matters in the Adversary Proceeding have required the most time and work for the sale process to date.

The first major step in the sale process was the termination of the Timeshare Plan, in accordance with S.C. Code § 27-32-520. The termination of the Timeshare Plan was made effective at a Special Meeting of the timeshare owners conducted on September 13, 2019, and recorded by the filing of the <u>Termination of Supplemental Declaration for the Sand Castle South Timeshare Ownership Plan</u> on October 18, 2019 in Deed Book 4253 at Page 599 in the Office of the Registrar of Deeds for Horry County, South Carolina.

The second major step in the sale process was the filing of the Adversary Proceeding on December 16, 2019. The Complaint in the Adversary Proceeding named all owners (the former timeshare owners) of record as defendants (the "**Defendants**"), and alleged causes of action for partition, for sale of co-owned property under 11 U.S.C. § 363(h) (a provision in the Bankruptcy Code similar to partition), for setoff of sale proceeds that might otherwise go to owners who are delinquent in payment of maintenance fees owed to the Association against the amounts owed by them to the Association, and for quiet title. The progress and status of the Adversary Proceeding is discussed below under section 2 of this Addendum.

The third major step in the sale process will be the filing of a motion to authorize a sale of the Condominiums. This step differs from the second step in that the Adversary Proceeding is

---

[1] Terms used in this Addendum shall have the same meaning as defined and stated in the Disclosure Statement.

2

necessary to consolidate title for a sale, so that a buyer can purchase full title in one sale, rather than negotiate with 818 separate owners. The third step occurs after the Association has obtained the order for partition and is able to propose a sale to a buyer to acquire full title in a single sale. The Association expects to file a motion to authorize a sale (the "**Sale Motion**") to a specific buyer (the "**Stalking Horse Bidder**") free and clear of liens, claims, encumbrances and other interests under 11 U.S.C. §§ 363(b) and (f). The motion likely will be accompanied by a motion to establish bidding procedures and bid protections as part of the sale process (the "**Bid Procedures Motion**"), which type of motion is generally routine in sales of all or substantially all assets of a bankruptcy estate.

The Sale Motion likely will be set for a hearing on a date that allows for solicitation of other offers for the Condominiums from potential buyers, with the goal of generating competitive bidding to maximize the value of the Condominiums. In some cases competitive bidding occurs and the sale price increases; however, in many cases no competitive bids are received. The circumstances of the property and the sale environment most likely will determine whether competitive bids will be received for the Condominiums.

As noted above, the first step in the sale process was completed in Fall of 2019. The second step in the sale process is expected to be completed in mid-May, 2020, or soon after. The third step in the sale process, is projected to be completed in June or July, 2020. In this regard, the Sale Motion should be filed around the time of the completion of the Adversary Proceeding (conclusion of the second step), and, allowing approximately thirty (30) days for the hearing on the Sale Motion, the Association hopes to obtain an order authorizing a sale in or about mid-June, 2020, or soon thereafter. The sale hopefully will close within two or three weeks after entry of the order authorizing it. The dates are uncertain, as there are still a number of variables involved; however, the Association believes it reasonable to project a sale of the Condominiums in June or July, 2020.

    2.    <u>The Progress and Status of the Adversary Proceeding</u>. As described above, the Complaint in the Adversary Proceeding named all owners known by the Association as Defendants. Of the 818 Defendants named in the Complaint, over 700 did not respond to it (the "**Default Defendants**"); nine Defendants responded to the Complaint (the "**Responding Defendants**"), but none contesting, and several expressly stating support for, the relief sought in the Complaint; and approximately 100 Defendants had their service mailings to them returned undeliverable (the "**Returned Mail Defendants**") by the United States Postal Service ("**USPS**"). The Association obtained default judgment against the Default Defendants (for partition, and not for a monetary recovery, except for the setoff of amounts owed by Delinquent Owners to the Association), and the Association will request a hearing on the responses of the Responding Defendants, to have partition also granted as to them. As for the Returned Mail Defendants, the Association obtained authorization to serve them by publication in the <u>Sun News</u> newspaper in Horry County, South Carolina. The published service notice has begun.

After entry of default against the Default Defendants, and upon leave granted by the Court, the Association amended the Complaint (the "**Amended Complaint**") on March 17, 2020 to add three classes of unknown persons as defendants. The **John Doe Defendants** are comprised of any and all heirs and assigns of the Defendants, and any other transferees of the Defendants' interest

3

which are not of record with the Association, including any person who may be in the military service of the United States of America. The **Richard Roe Defendants** are comprised of any unknown minors or persons under disability, including incompetent persons. The **Steven Stoe Defendants** are comprised of any spouses, former spouses, relationship partners and family members of any named Defendant who believes that he or she owns an interest in the Condominiums, such as a co-interest with a named Defendant, including any person who may be in the military service of the United States of America. On April 13, 2020, the Association also filed a motion for the appointment of a guardian ad litem to represent the interests of unrepresented John Doe Defendants, Richard Roe Defendants and Steven Stoe Defendants.

The Order authorizing service of the Returned Mail Defendants, entered on March 16, 2020 [Doc. 25], also authorizes service upon the John Doe Defendants, the Richard Roe Defendants and the Steven Stoe Defendants by publication, as part of the same publication service in the Sun News.

The service by publication occurs by publication once a week for three consecutive weeks in the Sun News. The third and final publication is to be made on or about April 10, 2020. The time for the Returned Mail Defendants and any of the John Doe Defendants, the Richard Roe Defendants and the Steven Stoe Defendants to respond to the Amended Complaint will be thirty (30) days from the final published notice, which should be on or about May 10, 2020. Although one or more of these Defendants could respond, the Association is informed and believes it is unlikely that any answers or responses contesting the relief sought in the Amended Complaint will be filed. If none are filed, the Association hopes to obtain default judgment against these Defendants in mid-May, 2020.

The Association hopes to have a judgment of partition as to all Defendants by mid-May, 2020. This judgment should enable the Association to proceed with the sale of the Condominiums.

The Chapter 11 Plan of Liquidation (the "**Plan**") is being amended to state that the Condominiums will be sold within one year after the entry of the partition judgment. However, as stated above, the Association expects that the sale will be accomplished in June or July, 2020, or soon after.

3. The Expected Stalking Horse Bidder. Cherokee Motels, Inc. ("**Cherokee Motels**") has made an offer to the Association to purchase the Condominiums for the purchase price of $703,500.00. The offer is stated in Cherokee Motels' Third Revised Letter of Intent to Purchase Condominium Units dated February 6, 2020 (the "**Revised Offer**"). Cherokee Motels previously had made an offer to purchase the Condominiums for $840,000.00. As stated in its Revised Offer, Cherokee Motels reduced its offered purchase price to reflect the cost of mold remediation stated in a consultant's report it obtained. Based on the estimate of $136,500.00 of mold remediation costs, Cherokee Motels' offer is now for the purchase price of $703,500.00.

Cherokee Motels owns other units and interests in the Sand Castle South building in which the Condominiums are located, and it or one or more of its principals is an officer or director of the Master Association, the property owners association for the entire building. Cherokee Motels' existing interests in the building make it a logical potential buyer for the Condominiums. It has a

stake in the disposition of the Condominiums. What becomes of them will likely have a material impact on the value of its existing property interests. If another buyer were to appear, one that is likely to properly renovate the Condominiums, Cherokee Motels might decide to not competitively bid and to leave it to the other buyer to purchase the Condominiums. However, in the absence of another credible buyer with good intentions for the property, Cherokee Motels has strong reasons to purchase the Condominiums.

The Association has not yet filed a Sale Motion to obtain authorization to sell the Condominiums to Cherokee Motels. The Association has been working to complete the second major step in the sale process, the consolidation of title for a sale by the partition action in the Adversary Proceeding. As the Adversary Proceeding appears to be nearing the point of a judgment of partition as to all of the owners of the Condominiums, the Association projects that it will be able to file and serve the Sale Motion in mid-May or soon after.

4. Auction as a "Back-Stop" if Unable to Sell the Condominiums. The Association expects to sell the Condominiums in a sale under the Sale Motion, and Cherokee Motels is expected to be the Stalking Horse Bidder. However, the Plan, as amended, provides that in the unlikely event that no sale to a buyer under a contract of sale or asset purchase agreement is achieved within one year after the date of the entry of the final judgment of partition in the Adversary Proceeding, the Association will arrange an auction of the Condominiums by a qualified auction company. The auction will be within sixty (60) days after the expiration of the one year period for a private sale.

In this event, the auction proceeds will first be used to pay the costs of the auction and sale; then to pay *ad valorem* taxes due on the Condominiums; and then to pay administrative priority expenses on a pro rata basis (not to exceed the amounts due). After payment of the administrative priority claims, the remaining auction proceeds will be divided into the Active Owners Funds (as defined in the Disclosure Statement and in the Plan) and the Association Funds (as also defined in the Disclosure Statement and in the Plan).

The Active Owners Funds will be distributed to the Active Owners. The Association Funds will be used first to pay priority creditors who are not administrative priority creditors, if any, on a pro rata basis (not to exceed the amounts due); then to non-priority unsecured creditors on a pro rata basis (not to exceed the amounts due), and then to the Active Owners on a pro rata basis.

5. Expected Administrative Priority Claims. The Association has been paying post-petition expenses during this case, but it expects to owe significant amounts for administrative expenses at the time of the sale of the Condominiums. These unpaid administrative expenses are anticipated in four areas, set forth below. The Association will seek to have a deadline established for the filing of administrative claims (the "**Administrative Claims Bar Date**"), for forty-five days after the closing of the sale of the Condominiums; however, this deadline may be extended if issues exist regarding the sale or the use of the sale proceeds, to a date reasonably soon after such issues are decided or resolved. The administrative priority creditors who have been paid in the ordinary course of business during this case (*e.g.*, insurance, the claims and noticing agent in this case, UST Quarterly Fees) will not

5

be required to file for approval or allowance of their administrative priority claims. Professionals employed by the Estate shall file final fee applications by the Administrative Claims Bar Date.

      a.      Post-petition *ad valorem* taxes. These taxes are a secured claim that must be paid along with prepetition *ad valorem* taxes at the closing of the sale of the property. The amount of post-petition taxes owed by the estate will not be known until a sale occurs. At the filing of the case, $42,585.81 was due for 2018. The amount due for 2019 was $39,700.96, but this amount must be prorated to separate the portion that is prepetition and the portion that is post-petition. However, in light of the secured nature of these property taxes, it appears that the proration is not important; the full amount of the *ad valorem* taxes must be paid from the sale proceeds of the Condominiums. The current outstanding amount due is $82,286.77 through December 31, 2019, and it is expected that another $23,158.33 may be owed for the period through closing (using the 2019 tax amount, and prorating the Association's share through July 2020, by which it is expected that a sale will close; the actual amount will depend on the total tax for 2020 and the date of the closing of the sale). If so, the total *ad valorem* taxes due will be approximately $105,500.00.

      b.      Post-Petition Loan by LaTour Hotels and Resorts, Inc. LaTour made a post-petition loan (the "**Loan**") to the Association to fund necessary expenses through the closing of the sale of the Condominiums. The Loan was authorized pursuant to the Order (1) Authorizing the Debtor-in-Possession to Obtain Post-Petition Credit Pursuant to 11 U.S.C. § 364(b); and (2) Granting the Post-Petition Lender an Administrative Priority Claim Under 11 U.S.C. § 503(b)(1) for Such Credit entered on February 19, 2020 [Doc. 75] in this case. The Loan is for an aggregate amount not to exceed $75,000.00, and it is to be advanced in increments as reasonably needed for the Association to assure that it has funds to cover its administrative expenses (excluding the fees of the Association's attorneys, which are to be paid from proceeds of the sale of the Condominiums). The Loan bears interest at the rate of 6% per annum. The Loan is unsecured, but it has administrative priority status as a claim against the estate. As of this date, approximately $10,000.00 of the funds available under the Loan (*i.e.*, $10,000.00 of the $75,000.00) have been advanced. A substantial portion of the remaining loan availability is expected to be needed for the costs of service of documents on the creditors and owners, including the Disclosure Statement, this Addendum, the Plan, the Court's Order approving the Disclosure Statement and setting the schedule for the confirmation hearing on the Plan, and ballots for voting on the Plan. The Loan is due and payable upon the earliest of (i) the sale of the Condominiums, (ii) the conversion of this case from Chapter 11 to Chapter 7, (iii) the dismissal of this bankruptcy case, and (iv) March 15, 2021.

      c.      Post-Petition Fees Due to the Master Association. The Sand Castle South Horizontal Property Regime, a/k/a the Master Association, has a claim for post-petition fees due from the owners of the Condominiums (the former timeshare owners under the Timeshare Plan). The Association was responsible for collecting from the owners the maintenance fees and assessments due to the Master Association and remitting payment to the Master Association. The Association has collected no fees or assessment payments from the owners since the commencement of this case, and has remitted no payment to the Master Association. As of April 1, 2020, the Association is informed and believes that the accrued, unpaid post-petition fees are in the amount of $174,297.36.

      d.      Fees and Expenses of Nexsen Pruet, LLC. Nexsen Pruet, LLC ("**Nexsen Pruet**") is the Association's attorney in this case. Nexsen Pruet has not yet filed an application for approval of fees and expenses in this case because, as a practical matter, the majority of its fees and expenses cannot be paid until the Condominiums are sold. It holds a retainer balance of $36,108.70, representing the portion of the prepetition retainer remaining at the filing of this case. Upon Court approval of fees and expenses, the retainer funds will be applied toward payment of the approved amount. The balance of approved fees and expenses will be paid from the sale proceeds of the Condominiums. At present, Nexsen Pruet has accrued fees and expenses of approximately $300,000.00 (without deducting the retainer amount). Additional fees and expenses will be incurred. Nexsen Pruet has not yet filed an application for approval of these fees and expenses, and thus they are not approved as of this date.

These fees and expenses reflect the complexity of this case. This case has been complex due to it being the first case under the new provisions of S.C. Code § 27-32-520 for termination of a timeshare plan and the sale of the timeshare property; due to the required steps for termination and sale; and due to the number of timeshare owners (now owners as tenants in common). Given the status of the Adversary Proceeding, the Association having a Stalking Horse Bidder, and the status of the Plan filed by the Association, Nexsen Pruet projects that its additional fees and expenses prospectively will be $25,000.00 - $50,000.00, depending on whether any new issues are raised.

    6.    Creditors Who May Be Deemed Insiders. The creditors of the Association include several companies who may be deemed insiders of the Association. These companies include LaTour, which provided management services to the Association; CRM of the Carolinas, LLC ("**CRM**"), which provided property maintenance services; Resort Travel and Xchange, Inc. ("**Resort Travel & Xchange**"), which provided timeshare exchange services; Zealandia Capital, Inc. ("**Zealandia Capital**"), which provided collection and loan services; and TSA Choice, Inc. ("**TSA Choice**"), which provided telephone services, televisions, security cameras and other similar devices and services to the Association. LaTour, CRM, Resort Travel & Xchange, Zealandia Capital and TSA Choice, are each affiliates of one another and are affiliated with Herbert H. Patrick, Jr., a/k/a Butch Patrick, the President of the Association's Board of Directors. Thus they may be deemed insiders of the Association.[2] As insiders, their votes on acceptance of the Plan may not be counted for determination of requisite acceptance for confirmation, pursuant to 11 U.S.C. § 1129(a)(10).

These companies provided operating services to the Association, and their claims are for unpaid services under their contracts with the Association. The Association is informed and believes that each of the contracts was consistent with industry norms. These contracts are inactive since May of 2019, in light of the termination of the timeshare operation.

It is noted that claims of an insider are not automatically disallowed or subordinated due to insider status. Insider status is generally significant in the review of the fairness of the transactions

---

[2] The Association also contracted with Sun Hospitality, LLC, which provided housekeeping services. Sun Hospitality, LLC is not an affiliate of the other companies or of Mr. Patrick, and is not believed to be an insider.

7

and treatment of the insider creditors. In this case, LaTour, CRM, Resort Travel & Xchange, Zealandia Capital and TSA Choice are creditors because they did not discontinue services even when the prospects for payment were becoming doubtful. The Association is informed and believes that if these companies were not affiliated with Mr. Patrick, but instead third-party vendors, they would likely have discontinued services to the Association prior to the Association closing the timeshare operation.

7. *Ad Valorem* Taxes on the Condominiums. The Condominiums are subject to a lien for unpaid property taxes due to Horry County, South Carolina. At the filing of this bankruptcy case on May 22, 2019, the Association's records reflect an amount due of $42,585.81. This amount represents the unpaid taxes for 2018. For 2019, the amount due is $39,700.96. An additional amount will be due in 2020 for the prorated taxes from January 1, 2020 through the date of the closing of the sale of the Condominiums. Accordingly, the amounts due through December 31, 2019 total $82,286.77, and an additional amount will be due for the prorated 2020 taxes, *e.g.*, $23,158.33 (seven months of the 2019 tax amount, assuming the 2020 tax in the same amount). By South Carolina statute, these taxes are a first lien on the property, and Horry County holds a claim in the amount due which is secured by the Condominiums.[3] (It should be noted, however, that the United States Trustee has expressed questions about whether the *ad valorem* taxes are a secured claim, or an unsecured claim with priority under 11 U.S.C. § 507(a)(8).)

8. Objections to Claims. The Plan is amended to state that the Association will file any objections it has to filed claims in this case **no later than thirty (30) days after confirmation of the Plan.** Only twelve (12) proofs of claim have been filed in this case. The Association expects to file objections to five of the filed claims, on the basis that they appear to seek recovery from the Association's estate of the purchase price of timeshare units; the Association did not sell the units to the claimants or provide financing for their purchase, and it should not be liable for the return of the purchase price of the units. The Association may also object to other claims on other grounds, which objections may seek modification of the claim or claim amount rather than disallowance.

9. Tax Consequences of the Plan. The Disclosure Statement includes a statement regarding the Tax Consequences of the Plan and its provisions, on page 27. The Association is informed and believes that, other than payment of *ad valorem* taxes due on the Condominiums, it is current in both its tax returns and payment of tax obligations (to the extent it has/had any). Furthermore, the Association is informed and believes that it will incur no tax liability by or upon the sale of the Condominiums or by the effect of the Plan's provisions. After deducting its costs of this case, and the expenses incurred in 2019 prior to the commencement of this case, and taking into account the Association's operating losses in prior years, the

---

[3] As stated in the Disclosure Statement, these taxes may also be entitled to priority status under 11 U.S.C. § 507(a)(8). However, priority status is not likely to be important, given that the taxes are secured by the Condominiums and must be paid from the sale proceeds of the property.

8

Association is informed and believes that it will have no tax liability.

With regard to creditors and owners, the Association is not aware of any tax liability that they will incur as a result of the Plan and its implementation, however, as stated in the Disclosure Statement:

**EACH HOLDER OF A CLAIM OR AN INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE EFFECTS OF THE PLAN ON SUCH CLAIMANT OR INTEREST HOLDER, INCLUDING ANY APPLICABLE UNITED STATES FEDERAL, STATE, LOCAL OR FEROEIGN TAX CONSEQUENCES.**

**NOTICE IS HEREBY GIVEN, PURSUANT TO UNITED STATES TREASURY DEPARTMENT CIRCULAR 230, TO HOLDERS OF CLAIMS OR INTERESTS THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT (INCLUDING THIS ADDENDUM) IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON SUCH HOLDERS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE PLAN PROPONENTS (THE ASSOCIATION IN THIS CASE); AND (C) HOLDERS OF CLAIMS OR INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

10. <u>Distribution to Creditors</u>.  The expected distribution to creditors is not expected to fully pay non-priority unsecured creditors, unless the Association is successful in obtaining a sale at a much higher price than the Stalking Horse Bidder's proposed purchase price for the Condominiums.  Similarly, Active Owners should not expect to receive a substantial payment for their interests in the Condominiums.  At the present Stalking Horse Bidder price, the secured claim of Horry County for *ad valorem* taxes will be paid in full, the post-petition assessments of the Master Association will be paid in full (as administrative priority expense), the post-petition Loan will be paid in full, and other administrative expenses will be paid in full; non-priority unsecured creditors are likely to receive payment of only 2.3% of their allowed claims; and Active Owners will probably receive approximately $19.38 each for their interests.  Delinquent Owners will receive no payment for their interests.

**The actual outcome of the sale and the net proceeds for distribution to creditors and Active Owners depend on a number of variables.  Accordingly, the distributions are not known and, at present, can only be estimated based upon assumptions made.  However, to illustrate what the Association believes is a reasonably possible outcome, the following estimates are provided.**

<u>Assumptions Made for Illustration</u>.  The following assumptions are made for the illustration of the possible distribution under the Plan:

9

    a.  The sale price is the Stalking Horse Bidder price of $703,500.00.

    b.  The *ad valorem* taxes for 2018 and 2019 total $82,286.77, and the prorated 2020 *ad valorem* taxes are estimated in the amount of $23,158.33 (based upon a closing in July, 2020), for a rounded total of $105,500.00 in *ad valorem* taxes to be paid at closing.

    c.  The closing costs to be paid by the Association, as seller, are only $10,000.00 (they could be higher, depending on whether any closing issues are identified).

    d.  The administrative priority claims for payment total $550,000.00. This rough estimated amount consists of repayment of the $75,000.00 post-petition loan, United States Trustee fees of $7,500.00, approved fees and expenses of Nexsen Pruet in the amount of $300,000.00 (after applying the retainer it now holds, and an agreed discount on its fees), and $175,000.00 of post-petition fees owed to the Master Association, and includes an anticipated small discount in the claim amounts.

    e.  A reserve of $30,000.00 is held to cover the costs to complete the case, including post-plan confirmation matters. These costs will include the costs of service of process, which are substantial with each mailed service in this case. The number of persons to be served has driven the costs of service to higher levels than might be expected for a case of this dollar size.

    f.  Based upon the percentage of ownership units of Active Owners, in relation to total ownership of all units, the Active Owners hold 12.6% of the ownership interests.

  Projected "Waterfall" of Funds to Creditors and Active Owners. The following depicts the distribution of funds to creditors and Active Owners in this case, based upon the above assumptions:

    a.  Funds Available for Payment (from sale) - $703,500.00

    b.  Items to Be Paid from Sale Proceeds –

     *Ad Valorem* Taxes - $105,500.00
     Costs of Sale - $10,000.00
     Administrative Priority Claims – $525,000.00
     Reserve for Completion of Case - $30,000.00

    c.  Split Between Association Funds and Active Owner Funds –

     Funds Available After Payment of the Above Items - $20,000.00

     Active Owners to Receive $ 2,520.00 (to be prorated among them)
     The Association to Retain $17,480.00 (for payment of creditors)

    d.  Distribution to Non-Priority Unsecured Creditors –

     Funds for Distribution $17,480.00

        Total Claims $760,972.18 (amount of filed unsecured claims)
        Percentage Payment 2.3%

    e.    Distribution Among Active Owners (Pro Rata)

        Funds for Distribution $2,520.00
        Number of Active Owners 130 (rounded estimate)
        Payment to Each Active Owner $19.38

It is reiterated that the above calculations are illustrative, and that the actual distributions are unknown and could vary significantly from the above calculations.

11.    <u>Supplement to Liquidation Analysis in the Disclosure Statement</u>. The Disclosure Statement includes, under Article IV.F (beginning on page 19), a Liquidation Analysis. As noted therein, it is difficult to accurately project what creditors would receive in a Chapter 7 bankruptcy, for comparison to their expected recovery under the Plan. However, with the Stalking Horse Bidder's proposed purchase price, the Association now has better information to explain its conclusion that creditors would receive no greater recovery, and might receive no recovery, if this case were proceeding under Chapter 7. In this regard, the following:

    a.    The source of payment of creditors and a distribution to Active Owners is the sale proceeds of the Condominiums. Absent the termination of the Timeshare Plan that has been accomplished and the partition pursuant to the Adversary Proceeding, a sale of the Condominiums is believed to be not viable. Unless the Condominiums are sold, there will be no material source of payment for creditors and distribution to Active Owners.

    b.    Even if this case were converted to Chapter 7 after judgment is obtained in the Adversary Proceeding, so that a Chapter 7 trustee could proceed with the sale, it must be assumed that the trustee's sale would generate no higher value than the sale the Association proposes under the Plan (which will be proposed under the separate Sale Motion), and the recovery to creditors would be no greater than the recovery to occur under the Plan. Indeed, because the Chapter 7 trustee would incur expenses in learning and taking over the case, and he would be entitled to trustee compensation, the total administrative expenses incurred under Chapter 11 and then in Chapter 7 likely would diminish the recovery for creditors.

    c.    Other than the Association's share of the proceeds from the sale of the Condominiums, the Association has no assets with material value. Payment of administrative expenses and creditors hinges on the successful sale of the Condominiums.

    (1)    As explained in the Disclosure Statement (on page 15), the Association has over $2 million of accounts receivable, representing the unpaid maintenance fees and assessments of the Delinquent Owners,[4] but those accounts receivable are deemed uncollectible, and have no value other than for use in setoff against sale proceeds of the Condominiums that otherwise might

---

[4] Festiva Development Group, LLC, which previously owned 1,254 ownership units that it transferred to the Association, owes no amount to the Association. It was current in all payments at the time of its transfer of the units to the Association.

11

be payable to the Delinquent Owners. Issues and problems in collection would exist in regard to: the amounts owed by each of the Delinquent Owners are relatively small in relation to the time and expenses of collection; the legal costs of pursuing collection would negate much of the benefit from the collection action; defenses may exist under timeshare law limiting recovery to the forfeiture to the Association of the owner's interest in the Condominiums; many of the Delinquent Owners failed to maintain their current address in the Association's records and, as a practical matter, may be unreachable; and the net recovery, if any, would be small. For these reasons, and others, these accounts receivable are uncollectible and have no value in a Chapter 7 bankruptcy.

(2)    The estate has a potential preference avoidance action under 11 U.S.C. § 547(b) against Cherokee Motels for $40,000.00, for payment made to it within ninety (90) days prior to the bankruptcy filing. Even without deducting the costs to pursue this action, and assuming the full $40,000.00 were recovered, the funds would not cover the administrative expenses of this case. Post-petition taxes, post-petition fees due to the Master Association, the costs of mailings and service upon the creditors and owners, and repayment of the post-petition loan in this case, would aggregate more than the $40,000.00. Plus, of course, there are and would be professional fees and expenses. These potential preference recovery funds, if collected, would not produce any recovery to prepetition creditors or to owners, unless the sale of the Condominiums occurs.

(3)    As discussed in the Disclosure Statement (page 16), LaTour received payments during the one year period preceding the filing of this case, which are reviewable for possible avoidance as a preference under 11 U.S.C. § 547(b). The Association is informed and believes that the payments were made in the ordinary course of business, pursuant to the LaTour contract for its management services, and that LaTour would have defenses to an avoidance action. However, even if the full amount paid, $136,053.62 (this amount actually includes payments prior to the preference avoidance period, which would have to be deducted), it still would not provide a recovery greater than the administrative priority claims existing in this case, and it would provide no recovery to prepetition non-priority, unsecured creditors, or to owners.

(4)    In its schedules, and in the Disclosure Statement (page 15), the Association lists furniture, equipment and fixtures, and other contents of the Condominiums, with an estimated total value of $19,500.00. The FF&E and other contents are old, they have been much used, and it is believed that, if assembled for sale, such as at an auction, they would not generate net funds of $19,500.00, but some lesser, unknown amount. The value of the FF&E and other contents would not provide value for payment to creditors and/or owners.

In summary, the only realistic prospect for payment of the *ad valorem* taxes and the administrative expenses of this case, and for any payment to prepetition non-priority, unsecured creditors and to Active Owners is by and through the sale of the Condominiums. The Plan is a plan of liquidation, incorporating the sale of the Condominiums and providing for a distribution of the sale proceeds, as projected above under "10. Distribution to Creditors." In a Chapter 7 case, the trustee would attempt the same. As such, the Plan provides as good a recovery for creditors and Active Owners as they would receive in a Chapter 7 case.

12.    <u>Treatment of Class 3 Under the Plan</u>.  As stated in the Plan and in the Disclosure Statement, Class 3 under the Plan is comprised of the claims of Active Owners for their ownership interests in the Condominiums, to the extent that such claims are

12

made against the Association. These claims will first receive payment from funds which are not property of the estate, the portion of sale proceeds attributable to each of the Active Owners' ownership share. In this regard:

a. The Association does not own the Condominiums. It now owns a large majority of the units of ownership interest (formerly timeshare units) in the Condominiums, but is a co-owner with the other Active Owners and Delinquent Owners, as tenants in common. Accordingly, the sale proceeds of the Condominiums are not entirely property of the bankruptcy estate.

b. The sale of the Condominiums is made possible under S.C. Code § 27-32-520, which provides for a sale by the steps described in Section 1 hereinabove. Pursuant to the statutes, the costs incurred in accomplishing the sale and distributing the sale proceeds may be taken from the total sale proceeds, before apportioning the sale proceeds to each owner. The Association is informed and believes that the costs it has and is incurring in these matters, including the costs of this case and the legal fees incurred, are chargeable and to be paid from the sale proceeds of the Condominiums before distribution of sale proceeds to owners.

c. After payment of its costs (including the costs of this case), the Association will divide the net sale proceeds into the portion that would be paid to Active Owners and the portion that would be paid to Delinquent Owners and the Association. The division will be based on the percentage of the ownership interests of each category. The Active Owners own approximately 12.6% of the total ownership interests; the Delinquent Owners and the Association own a combined approximately 87.4% of the total ownership interests.

d. The Association, by way of setoff, will be entitled to retain the sale proceeds otherwise payable to the Delinquent Owners. The setoff is to pay the amounts owed to the Association by the Delinquent Owners. Therefore, the approximately 87.4% share of the net sale proceeds will be retained by the Association. These funds are defined in the Plan as the "Association Funds."

e. The portion of the net sale proceeds due to the Active Owners, approximately 12.6% of the net proceeds, is defined in the Plan as the "Active Owners' Funds." These funds are deemed to be owned by the Active Owners and are not property of the bankruptcy estate. These funds will be paid to the Active Owners on an equal share basis.[5]

f. The Plan provides that the Association Funds will be used to pay the Association's creditors. If any funds remain after full payment of the creditors (not likely unless the price significantly increases above the existing Stalking Horse Bidder proposed purchase price), which funds are defined in the Plan as the "Remainder Funds," those funds will be distributed to Active Owners.

g. The Class 3 claims against the estate are those of the Active Owners for a share in the Remainder Funds. The Active Owners already will have been paid the Active Owners'

---

[5] The Association considered attempting a pro rata distribution, but to do so would require valuations of the different weeks of the year, valuation of each of the 40 Condominiums, and other factors that could affect one owner's assigned value, all of which is deemed impractical and too expensive to realistically accomplish.

13

Funds. The Association Funds will have been used, first, to pay creditors. The Remainder Funds would be the only source of payment of Class 3 from the bankruptcy estate.[6]

13. <u>Potential Preference Avoidance Actions, In the Event that Sale Price Does Not Fully Pay Creditors</u>. The Disclosure Statement discusses prepetition (pre-bankruptcy) payments made to Cherokee Motels and to LaTour that potentially may be avoidable as preferences under 11 U.S.C. § 547(b). The Disclosure Statement states that, "if the Condominiums sell at a price sufficient to fully pay all allowed claims, no avoidable preference will exist." At present, however, based on the Stalking Horse Bidder's proposed purchase price, the sale price will not be sufficient to enable full payment of all allowed claims. The Association will solicit responses among the non-insider creditors of their willingness to form have special counsel appointed to explore and possibly pursue these avoidance actions, and to oversee such special counsel as a liquidation committee under the Plan. This committee, if formed, will not be a committee under 11 U.S.C. § 1102 (*i.e.*, it will not be an official creditors' committee appointed by the United States Trustee and approved by the Court).

14. <u>Rejection Claims</u>. When an executory contract or lease is rejected by a Chapter 11 debtor-in-possession or a trustee, the other party(s) to the rejected contract or lease may have a claim for breach of contract damages under the contract or lease. *See* 11 U.S.C. § 365(g). In this case, the Association has not rejected any contracts or leases to date, nor has it assumed any. Upon confirmation of the Plan, any remaining contracts or unexpired leases will be rejected by operation of the Plan's provisions. *See* Plan Article II, Section 2.5(b) (page 11 of the Plan). Although it is possible that rejection claims could be asserted, the Association does not expect rejection claims. The contracts having duration beyond the initial stage of the case were with LaTour, for the management and operation of the Association; CRM, for maintenance of the Condominiums and areas used for the timeshare program; Resort Travel & Xchange, for timeshare exchange services; Zealandia Capital, for collection and loan services; and TSA Choice for telephone, television and security camera services. These companies are affiliates of the President of the Association Board, and they have not indicated any claim for rejection damages. They have neither provided their contracted services nor received any payment since the commencement of this case.

15. <u>Implementation and Consummation of the Plan Following Confirmation, and Indemnification of the Board</u>. As stated in the Disclosure Statement, in Article VI.B on page 25, following consummation of the Plan, the Association shall be dissolved. The current Board will remain in charge of implementation and consummation of the Plan. A liquidation committee may be formed among non-insider creditors, if at least three are willing to serve, to explore and possibly pursue preference avoidance actions.

---

[6] Again, it must be noted that the Active Owners' Funds are not part of the bankruptcy estate, and will be paid to the Active Owners.

14

The Board members shall be indemnified by the Association from the Association Funds in the event that claims are made against the Board members for their conduct or services as a member of the Board. The additional provision is now added (as had been intended) that the indemnification shall not apply to instances of negligent acts or acts conducted in bad faith, by fraud, in breach of fiduciary duty, or self-dealing.

16. <u>Other Items Raised by the United States Trustee to Be Addressed</u>. In its objection to the Disclosure Statement filed by the United States Trustee ("**UST**") on January 16, 2020 [Doc. 64], the UST raised many items it felt should be addressed as a condition for approval of the Disclosure Statement. Most are addressed above. Others are as follows:

a. <u>Discharge</u>. Article X of the Plan (on page 15 of the Plan) provides that, "The entry of an Order Confirming Plan acts as a discharge of any and all liabilities of the Association that are dischargeable under 11 U.S.C. § 1141." It should be noted that, because the Plan provides for a liquidation of the Association's assets, the Association will not be entitled to a discharge. 11 U.S.C. § 1141(d)(3).

b. <u>Responsibility for Post-Confirmation Monthly Reports and UST Quarterly Fees</u>. As stated in section 15 above and in Article VI.B of the Disclosure Statement, the current Board of the Association will be responsible for the implementation and consummation of the confirmed Plan. The implementation will include making, or arranging for an appropriate person to make, the monthly operating reports for the Association, and arranging for the payment of the UST Quarterly Fees. The UST Quarterly Fees will be paid until the case is closed, dismissed or converted to Chapter 7.

c. <u>No Creditors Committee in this Case</u>. No creditors committee has been appointed in this case.

d. <u>Festiva Development Group, LLC Paid All of Its Maintenance Fees During Its Ownership of Units</u>. Festiva paid all maintenance fees due on the units it owned during the period of its ownership of them. No maintenance fees were due on the units at the time Festiva transferred ownership to the Association.

e. <u>Risks Posed to Creditors Under the Plan</u>. The Association is informed and believes that the only material risks posed to creditors under the Plan are that the sale of the Condominiums might not occur as contemplated, the sale price could be less than expected, the administrative expenses of the estate could increase to the point that the estate becomes administratively insolvent, and the distribution of funds is dependent, both in amount and in timing, on the sale of the Condominiums. The Association is informed and believes that these risks exists under any alternative to address the current situation of the Association, its creditors and the owners.

f. <u>Meaning of Section 2.b of the Plan</u>. Section 2.b of the Plan provides for "Sales of Assets Having a Sale Price of $7,500 of Less." The Association has limited assets besides the Condominiums, most notable the FF&E. As discussed above in the Liquidation Analysis, the Association owns aged FF&E, the realizable value, if any, of which is undetermined.

15

Section 2.b is intended to address the situation in which a sale of an asset – at present, it appears only the FF&E would be possible – for a price of $7,500 or less were proposed. This provision also serves as a "catch-all" safeguard, in the event a small value asset is hereafter found to exist. Notably, the cost of service of notice of the sale on the mailing list of creditors, owners and parties in interest in this case would consume much, if not all, of the value to be derived from the sale. Accordingly, the Plan provides that for any small sales of $7,500 or less, notice shall be served on the ten largest creditors of the estate, any secured creditor affected by the sale, the UST and any party claiming an interest in the property to be sold.

    g. <u>Ownership Units Owned by the Association Are Neither Active Owner Units Nor Delinquent Owner Units</u>. The Association owns 1,254 or more (at least one additional unit has been transferred to the Association since the filing of this case) ownership units in the Condominiums. The Association does not owe itself, of course, the payment of maintenance fees or assessments for the units. Accordingly, the Association is not included in either the Active Owners or the Delinquent Owners for the units it owns.

  The above information is intended to supplement and, as appropriate, amend the Disclosure Statement. This Addendum should be deemed a part of the Disclosure Statement.

April 20, 2020         /s/ Julio E. Mendoza, Jr.
                Julio E. Mendoza, Jr., Court ID No. 3365
                NEXSEN PRUET, LLC
                1230 Main Street, Suite 700 (29201)
                Post Office Box 2426
                Columbia, South Carolina 29202
                Telephone: 803-540-2026
                Email: rmendoza@nexsenpruet.com

                Attorneys for Sand Castle South Timeshare Owners
                Association, Inc., Debtor-in-Possession

**IN THE UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re:<br><br>Sand Castle South Timeshare Owners Association, Inc.,<br><br>Debtor. | Case No. 19-02764-jw<br><br>Chapter 11 |

**CERTIFICATE OF SERVICE**

    I, Julio E. Mendoza, Jr., of Nexsen Pruet, LLC, do hereby certify that a copy of the **ADDENDUM TO DISCLOSURE STATEMENT TO CHAPTER 11 PLAN OF LIQUIDATION FILED ON DECEMBER 18, 2019, AS AMENDED,** was served upon all parties receiving notification through the Court's ECF/NEF System, and the following party by electronic notification through the Court's ECF/NEF System at the time of filing, on this the 20th day of April 2020, at Columbia, South Carolina.

    Elisabetta G. Gasparini, Esquire
    Office of the United States Trustee
    1835 Assembly Street, Suite 953
    Columbia, SC  29201

    /s/ Julio E. Mendoza, Jr.
    Julio E. Mendoza, Jr. (#3365)
    NEXSEN PRUET, LLC
    1230 Main Street, Suite 700 (29201)
    Post Office Box 2426
    Columbia, South Carolina 29202
    Phone:  (803) 540-2026
    Fax: (803) 253-8277

    Attorneys for Sand Castle Timeshare Owners Association, Inc.